# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Securities and Exchange Commission,   ) | |
| ) | |
| **Plaintiff,**   ) | |
| ) | |
| **vs.**   ) | **Civil Action No.:** |
| ) | |
| Merge Healthcare Incorporated, f/k/a/   ) | |
| Merge Technologies, Inc., Richard A.   ) | |
| Linden, Scott T. Veech,   ) | |
| ) | |
| **Defendants.**   ) | |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("the Commission"), for its Complaint, alleges as follows:

## SUMMARY

1.      This case concerns a fraudulent revenue recognition scheme from approximately early 2002 through late 2005 involving Merge Technologies, Inc., now known as Merge Healthcare Incorporated ("Merge" or the "Company"). Merge, a company with its primary office located in Milwaukee, Wisconsin, develops medical imaging software, hardware, and services. Merge failed to comply with Generally Accepted Accounting Principles ("GAAP") by, among other things, prematurely recognizing revenue on transactions in which Merge promised customers that a software feature would be delivered in the future.

2.      Merge's improper accounting was caused, in part, by the actions of Merge's former President and Chief Executive Officer, Richard A. Linden ("Linden"), and Merge's former Chief Financial Officer, Scott T. Veech ("Veech").

3.      The fraudulent accounting practices at Merge involved the improper recognition of revenue from sales on transactions: (1) which included promises of specified future software enhancements; (2) which included sale contingencies; and (3) in which Merge failed to properly execute contracts and/or failed to properly deliver products in the same fiscal period in which Merge recorded revenue from those transactions.  Linden also interfered with the audit confirmation process between certain of Merge's customers and Merge's outside auditor by instructing, or causing others to instruct, some of Merge's customers not to disclose side agreements, to the extent they existed, between Merge and the customer.

4.      These fraudulent accounting practices caused Merge to overstate its net revenue by approximately 26% and overstate its net income by approximately 230% from its first quarter of 2002 through its second quarter of 2005.

5.      The Audit Committee of Merge's Board of Directors ("Audit Committee") discovered the accounting fraud in early 2006 and disclosed the Company's accounting misstatements to the public between February and August 2006.  During this time, Merge's stock price dropped from $24.50 to $7.30 per share, reflecting a $500 million loss in market capitalization.  In August 2006, Merge restated its financial statements for its 2002-2004 fiscal years and its first three fiscal quarters of 2005.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77v(a)], and Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)-(e), 78aa].  The Defendants have, directly or indirectly, made use of the means and instrumentalities of

Case 2:09-cv-01036-CNC    Filed 11/04/09    Page 2 of 25    Document 1

interstate commerce, or the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged in this complaint.

7.      This is an appropriate venue under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  All of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Eastern District of Wisconsin, the corporate defendant is located here, and one of the two individual defendants resides here.

## THE DEFENDANTS

8.      Merge Healthcare Incorporated, formerly known as Merge Technologies, Inc., is a Delaware corporation with its primary office located in Milwaukee, Wisconsin.  Merge develops medical imaging and information management software and delivers related services.  At all relevant times, Merge's common stock has been registered with the Commission pursuant to Section 12(g) of the Exchange Act, and traded on the NASDAQ Small Cap or National Market under the symbol "MRGE."

9.      Richard A. Linden, age 48, resides in Barrington, Illinois.  Linden was Merge's President and Chief Executive Officer of Merge from September 2000 through May 2006, when he resigned.

10.     Scott T. Veech, age 47, resides in Whitefish Bay, Wisconsin.  Veech was the Chief Financial Officer, Secretary, and Treasurer of Merge from July 2002 through July 2006, when he resigned.

# FACTS

## Relevant Accounting Standards

11.     As a public company, at all relevant times Merge was required to file quarterly and annual reports with the Commission that presented its financial results in conformity with GAAP. Statement of Position 97-2, *Software Revenue Recognition (*"SOP 97-2"), issued by the Executive Committee of the American Institute of Certified Public Accountants, and related interpretations are the principal GAAP provisions governing the recognition of revenue for sales of software. SOP 97-2 generally requires that, if there is not significant production, modification, or customization of the software, revenue may be recognized if: (1) there is persuasive evidence of an arrangement; (2) delivery has occurred; (3) the fee is fixed or determinable; and (4) collectibility is probable.

12.     SOP 97-2 contains specific guidance on revenue recognition for multiple-element arrangements.  Multiple-element arrangements are arrangements in which software companies such as Merge provide licenses for "multiple software deliverables" (that is, software products accompanied by promises of upgrades/enhancements, services, or post-contract support ("PCS")). For multiple-element arrangements, SOP 97-2 dictates whether a company may recognize revenue from a software license sale at the time of the sale, or whether the revenue from the sale must be recognized consistent with contract accounting principles, which typically require revenue recognition over the life of the contract or as the contract is performed.  SOP 97-2 provides that for multiple-element arrangements, the company should allocate revenue to the various elements based on vendor specific objective evidence ("VSOE") for each element.  With some exceptions, if the issuer cannot establish VSOE for each element, then the company must defer all revenue

until VSOE can be established for all elements in the arrangement or until all elements have been delivered.

13. SOP 97-2 also provides that where a software transaction contains multiple elements, and the company agrees to deliver software currently and provide the customer with a future right to a specified upgrade/enhancement: (1) if the upgrade right is *specified*, then the company must account for the upgrade right as a separate element, and, accordingly, must be able to establish VSOE for the specified upgrade right to be able to recognize any revenue at the time of the transaction; and (2) if the upgrade right is *unspecified*, then the company must account for the upgrade right as part of PCS and does not need to establish VSOE for the upgrade right to be able to recognize revenue at the time of the transaction. Because Merge lacked VSOE for software upgrades/enhancements described herein, Merge could not recognize any revenue at the time of a transaction where it provided a customer with a specified upgrade right in a multiple element arrangement.

14. During the relevant period, Merge's quarterly and annual reports represented that the company recognized revenue in accordance with SOP 97-2. Merge, however, had not complied with SOP 97-2 with respect to some customer contracts, and was instead recognizing revenue earlier than allowed under GAAP with respect to those contracts.

5

## Merge's Restatements

15.     In March 2006, the Company announced that the Audit Committee was conducting a review of anonymous complaints the Company had received and that previously issued financial statements for the quarters ended June 30, 2005 and September 30, 2005 should no longer be relied upon.  In July 2006, the Company announced that it had concluded that its financial statements since 2002 had been materially misstated due to improper accounting and financial reporting practices and that its financial statements for fiscal years 2002 through 2005 should no longer be relied upon.

16.     In August 2006, the Company filed its Form 10-K for the 2005 fiscal year, which also contained audited restated financial results for its 2002-2004 fiscal years and its first three fiscal quarters of 2005.  Because Merge's misstatements resulted from premature revenue recognition, revenue and net income were overstated during Merge's 2002 through 2004 fiscal years and the first two quarters of 2005.

17.     The following tables summarize Merge's restatement adjustments as they affected revenue and net income as restated:

($ in thousands)

| REVENUE | 2002 | 2003 | 2004 | 2005 1Q | 2005 2Q | 2005 3Q |
|---|---|---|---|---|---|---|
| As originally reported | 20,786 | 28,677 | 37,005 | 10,501 | 18,773 | 32,723 |
| (Over) understatement | (1,639) | (4,117) | (10,658) | (3,564) | (3,612) | 2,320 |
| As restated | 19,147 | 24,560 | 26,347 | 6,937 | 15,161 | 35,043 |
| Percentage overstatement | 9% | 17% | 40% | 51% | 24% | N/A |

| NET INCOME | 2002 | 2003 | 2004 | 2005 1Q | 2005 2Q | 2005 3Q |
|---|---|---|---|---|---|---|
| As originally reported | 3,629 | 6,239 | 7,467 | 2,096 | (11,877) | 8,117 |
| (Over) understatement | (862) | (1,805) | (5,277) | (1,931) | (3,324) | 1,483 |
| As restated | 2,767 | 4,434 | 2,190 | 165 | (15,201) | 9,600 |
| Percentage overstatement | 31% | 41% | 241% | 1170% | 22% | N/A |

## Overview of Improper Revenue Recognition at Merge

18.     As discussed above, under SOP 97-2, in a multiple-element software arrangement where a company agrees to provide a specified future upgrade/enhancement and the company cannot determine VSOE for that upgrade/enhancement, the company cannot recognize revenue on the arrangement at the time of the transaction.  Instead, the company must defer revenue recognition until the company can establish VSOE for all elements in the arrangement or until all elements have been delivered, including the upgrade/enhancement.  Merge did not establish VSOE for the software upgrades/enhancements described herein.  Instead, Merge promised some customers specified future software enhancements to induce those customers to sign contracts with Merge and, at the same time, to recognize revenue prematurely on those contracts.

19.     Merge employed two principal devices to carry out this improper revenue recognition.  First, Merge entered into oral and written side agreements with certain customers in which Merge promised those customers specified future upgrades/enhancements.

20.     Second, Merge obscured its promises of specified future upgrades/enhancements to customers.  Most significantly, Merge labeled specified future software enhancements as "updates," rather than "upgrades," in an attempt to promise enhancements to customers without jeopardizing Merge's ability to recognize revenue at the time of a transaction.  Merge's standard PCS agreement with its customers included only "updates" as part of PCS, not "upgrades."  Merge used the "update" label for features that functionally did not qualify as "updates" under Merge's PCS agreement, which defined an "update" as "a change to the Software and/or Products designed to correct defects, but does not materially change functionality."

21.     By far the most significant part of Merge's restatements involved Merge's premature revenue recognition where Merge, through Linden and Veech and/or at their explicit direction, promised to some customers that they would receive sophisticated "hanging protocols" functionality in the future.  "Hanging protocols" functionality provides radiologists with the ability to rearrange the sequence and orientation of images displayed.  Before Merge made significant enhancements to its hanging protocols feature in a late 2004 product release, radiologists who used Merge's software were unable to automatically display images from prior exams and other important images in the sequence and orientation that the radiologist desired.  The sophisticated hanging protocols functionality that Merge released in late 2004 allowed radiologists to automatically display prior exam images and other important images in the radiologist's desired sequence and orientation, thereby allowing the radiologist to work more efficiently.

22.     By approximately 2001, hanging protocols had become an important feature in the software offered by Merge and its competitors.  While Merge started offering a rudimentary version of hanging protocols beginning in 2001, Merge's version of hanging protocols lagged significantly behind competitors' versions.  Merge's lack of a sophisticated hanging protocols feature placed Merge at a competitive disadvantage.

23.     Therefore, in approximately 2002, Merge began devoting significant attention to developing a more sophisticated version of hanging protocols.  In November 2002, at the annual Radiological Society of North America ("RSNA") trade show in Chicago, Merge demonstrated, for certain customers, software which included sophisticated hanging protocols functionality.  The functionality was conceptual only at this time.  However, Merge's development of sophisticated hanging protocols functionality was repeatedly delayed.  Eventually, Merge released its

9

sophisticated version of hanging protocols in December 2004, although Merge did not actually deliver this release to customers until 2005. In November 2005, Merge released a second enhancement to hanging protocols as part of a product called Fusion RIS/PACS v.3.0, which Merge delivered to customers in 2006.

24.     Merge's demonstration of sophisticated hanging protocols functionality at the November 2002 RSNA trade show generated significant customer interest, and, during subsequent contract negotiations, some customers began requesting the sophisticated hanging protocols functionality upon release. However, under the applicable accounting rules, promising specified future upgrades/enhancements to customers could jeopardize Merge's ability to recognize revenue at the time of a transaction. Therefore, Merge began using side agreements and the "update" label to promise sophisticated hanging protocols functionality to some customers even though sophisticated hanging protocols functionality did not qualify as an "update" under Merge's contractual definition of that term.

25.     For example, in February 2004, Merge was negotiating a contract with a Pennsylvania radiology practice. In the negotiations, the customer requested that a number of assurances be added to the contract, including an assurance that the customer would receive Merge's sophisticated hanging protocols functionality when it was released. A salesperson drafted a side letter which she then emailed to Linden, Veech, and others. The draft side letter stated that the customer would receive the sophisticated hanging protocols functionality as a free "upgrade" upon its release. Linden edited the letter and emailed a new draft to Veech and others, stating: "Here is [sic] the old and new versions of the letter. The old version is clearly a problem. I've attempted to adjust the language to cover some of the points the customer probably wants to hear. Scott – This needs your attention for revenue recognition since any letter like this represents a

commitment from the company. The old letter will need to be voided. The new letter CAN'T make any commitment to future deliverables."

26.     Notwithstanding this email, however, Linden and Veech proceeded to craft a letter that promised hanging protocols as a future deliverable to the customer. The final side letter that Merge sent to the customer stated in pertinent part that the customer would receive hanging protocols and that "[a]s updates, these enhancements would be provided" to the customer "as part of the ongoing warranty and extended service contracts." The customer signed a $350,000 contract with Merge in March 2004. As part of the restatements, Merge deferred recognition of revenue on this contract to the fourth quarter of 2005 due to Merge's promise of sophisticated hanging protocols functionality to the customer as a specified future software enhancement.

27.     Of the 124 transactions in which Merge concluded that it had prematurely recognized revenue as part of Merge's restatements, many of the transactions involved Merge's promises of "hanging protocols" to customers. Merge's promises of sophisticated hanging protocols functionality as a specified future software enhancement to customers required Merge's deferral of the revenue on transactions that included these promises until the enhancements to hanging protocols were delivered in 2005 and 2006.

## Other Promises of Future Software Enhancements

28.     In addition to improperly recognizing revenue on transactions in which Merge promised customers enhancements to hanging protocols, Merge also improperly recognized revenue on transactions in which Merge made other promises of specified future software enhancements.

Case 2:09-cv-01036-CNC   Filed 11/04/09   Page 11 of 25   Document 1

29.     For example, in early 2003, Merge's Board of Directors discussed with Linden his use of a March 2003 side letter promising that certain software would remain compliant with the Health Insurance Portability and Accountability Act ("HIPAA").  Linden sent the side letter to Merge's customer to induce the customer to sign a March 2003 contract with Merge.  Merge's outside auditor discovered the side letter through the audit confirmation process during its April 2003 quarterly review for Merge's first quarter of 2003.  After the outside auditor confronted Linden and Veech with the side letter produced, Veech wrote a memo asserting that the letter did not commit Merge to provide the customer with future software enhancements.  The outside auditor disagreed and told Linden and Veech that because the letter committed Merge to keep the software HIPAA compliant, Merge had not established VSOE and needed to reverse the revenue that it had booked for the contract the first quarter of 2003.  In an April 25, 2003 email to Veech addressing the topic, an audit manager for the outside auditor told Veech: "This is a very serious matter and is an extreme sticking point.  If you have a future deliverable without VSOE, the entire arrangement is deferred until that element is delivered."  The outside auditor reported the existence of the side letter to Merge's Board of Directors, which issued an oral reprimand to Linden in approximately April 2003.

30.     Similarly, in December 2004, Merge entered into a $451,000 contract in which Merge promised future software enhancements to an Arizona radiology facility.  During 2004, Merge had been developing a feature that it referred to as the Referring Practice Portal ("RPP"), which allowed customers to distribute images and reports over the internet.  Merge eventually released the RPP in approximately mid-2005.  Before December 2004, the Merge salesperson assigned to the account had told the customer that Merge was developing the RPP, and the customer requested that it receive the RPP upon its release.  Merge sales personnel orally

promised to the customer that it would receive the RPP for free upon its release. In early December 2005, however, Merge told the customer that it was not entitled to receive the RPP for free and instead needed to purchase the RPP as an upgrade. Upon learning of Merge's statement, the salesperson responsible for the account sent an email to Linden and others, stating: "Merge does owe [the customer] the Referring Practice Portal, even though it is not in the contract. As you know, in 2004 and early 2005 it could not be put in the contract and Merge would make separate agreements with customers so we could ship and still recognize revenue." The salesperson added that sales management at Merge instructed him to offer the RPP to the customer "at no charge, as the incentive to sign the contract with Merge in December of 2004."

31.     In early 2006, Linden and Veech prepared a written response to the Audit Committee's internal investigation, which included this transaction. In the 2006 response, Linden and Veech asserted that Merge tried to sell the RPP as an upgrade to existing customers, even though it was functionally merely an update. Linden's and Veech's response to the Audit Committee stated that Merge "defines the RPP as an upgrade or add [on] for additional fees. This applies to customers who haven't purchased the Web Server [Merge's legacy technology] functionality. For those that have purchased the Web Server, we choose to position updates like this as something new and different to the customer, however the reality is its [sic] an update of no new functionality." The Audit Committee rejected Linden's and Veech's assertions.

32.     Because Merge promised and sold the RPP to certain customers from third quarter of 2004 through the second quarter of 2005 before the product contained all promised functionality, the Company was required to defer all revenue recognized upon delivery in any contract in which Merge promised the RPP. The Company deferred the recognition of revenue on contracts involving the RPP to the second quarter of 2006, when Merge delivered the RPP.

## Interference With the Audit Confirmation Process

33.     Linden, with the knowledge of Veech, interfered with the audit confirmation process by instructing Merge sales personnel to tell some of Merge's customers not to disclose side agreements, to the extent they existed, to Merge's outside auditor.  For example, in July 2003, Linden sent instructions to a Merge salesperson via email, copying Veech, and stated:  "Starting this week, we will need to run the contract confirm process for most, if not all, of the direct sales in 2Q.  As you know, this process is very important for the audit.  I would like you to own this process. . . .Make sure you talk directly to all accounts.  We can't have any hand written notes, side letters or hesitation with this process.  Please make this a priority today while you are in the office.  We need this to run smooth, clean and perfect in order to avoid any doubt about our direct sales revenue."

34.     Similarly, in October 2003, Linden sent a Merge salesperson an email message regarding a list of customers to whom audit confirmations were to be sent, and he instructed: "Every one on this needs to be contacted live, instructed on what to do AND what not to do (i.e., hand written notes, attachments, etc. . . )  Please keep Scott [Veech] and I posted on your progress to track them down."

35.     A specific example of Linden's interference with the audit confirmation process occurred in early 2005, when Merge signed a $110,000 contract with a Texas imaging center.  On March 31, 2005, the last day of the quarter, the customer sent a signed contract to Merge, but the customer placed a handwritten note on the contract stating that the contract was contingent on the customer's ability to obtain third-party financing.  Linden received the contract from internal sales personnel and emailed the Merge salesperson responsible for the account: "[The customer's contract] arrived with a contingency.  That doesn't work.  We can still process orders for another

hour or so if needed.  Go get em!!!!"  Shortly thereafter, the customer sent a signed contract to Merge with the contingency removed from the written contract.

36.     The next month, in April 2005, Linden sent a Merge salesperson an email instructing him to contact customers to get clean audit confirmations.  He said: "I need you to personally own all the Q1 transactions get contract confirms that are clean with no problems . . . We can't have any faxes come in with hand written notes . . . . and I don't trust the RSM [regional sales manager] enough to make sure that gets communicated to the customer.  Please own this personally and make sure it happens as we expect."  After being contacted by Merge, the Texas imaging center sent an audit confirmation to Merge' outside auditor which did not mention the contingency.  As part of the restatements, Merge, because of doubt over whether a contingency existed, reversed the revenue that Merge had prematurely recognized on this transaction.

### Improper Revenue Recognition Before Delivery

37.     In at least one instance, Linden caused Merge to improperly recognize revenue before delivery of any product to the customer had occurred.  Under GAAP, a software vendor may not earn revenue until the title and risks of ownership have passed to the customer through delivery of the product.  Where the customer does not agree to assume title and risk of ownership in a particular quarter, delivery has not occurred for purposes of revenue recognition, and the company is not allowed to recognize revenue.

38.     In late June 2002, Merge was in the process of finalizing a $246,500 contract with a Missouri hospital.  As of the end of the quarter, however, the contract had still not been finalized, and the customer explicitly stated that it did not want to receive shipment of the product until the contract had been finalized.  Nevertheless, as Linden noted in an email in late June 2002 to Merge sales personnel, "direct sales is coming in well short of its quarterly goal so we are getting

aggressive on a number of last minute orders." Accordingly, Linden instructed Merge's shipping department to ship the software to the customer on the last day of the quarter. He then instructed Merge sales personnel to try to convince the customer in early July 2002 to backdate the contract to June and accept delivery of the product that Merge had shipped on the last day of June. Linden stated: "This order represents the greatest degree of variability in our numbers for the quarter. All things being equal, I want this in 2Q, not 3Q. As your (sic) probably know, we choose (sic) to ship the units on Saturday 6/30 with a 3 to 5 business day slow delivery." In early July 2002, the customer, at Merge's instruction, backdated the contract and retroactively authorized shipment prior to the end of June 2002.

39.     Merge's recognition of revenue on this transaction in the second quarter of 2002 was premature because Merge, at Linden's direction, shipped product to a customer before the customer had executed a purchase order or authorized the purchase of hardware from Merge. Linden's conduct resulted in Merge improperly recording a significant amount of revenue from the transaction in the second quarter of 2002. As part of the restatements, Merge deferred the revenue that Merge had improperly recognized on the transaction from the second quarter of 2002 to the third quarter of 2002.

**Improper Revenue Recognition Where Merge Delivered Used Product**

40.     On at least one occasion, Linden caused Merge to improperly recognize revenue where Merge surreptitiously delivered used products to a customer which had ordered new products. In December 2002, Merge signed a $277,359 contract with a Massachusetts hospital to deliver new hardware. Although the customer told Merge in December 2002 that the customer did not need the hardware to be installed for several more months, Merge offered the customer

significant price incentives to sign the contract and accept delivery in December 2002 so that Merge could record revenue on the transaction in the fourth quarter of 2002.

41.     However, at some point before the end of December 2002, Merge discovered that it did not have the new hardware in stock that the customer had ordered.  Upon learning this information, Linden instructed Merge shipping department personnel to find used hardware similar to the new hardware that the customer had ordered and ship it to the customer, and Merge did so.

42.     In early 2003, Merge obtained the new product that the customer had ordered, and Linden instructed Merge's installation personnel on site at the customer to switch the used product Merge had shipped in December 2002 for the new product the customer had ordered and then install the new product.

43.     As part of the restatements, Merge concluded that delivery had not occurred in the fourth quarter of 2002 and that Merge had shipped used product to the customer instead of the new product the customer had ordered.  Accordingly, Merge deferred the revenue that Merge had prematurely recognized to the second quarter of 2003.

### Signing of False Management Representation Letters

44.     Between 2002 and 2005, Linden signed at least 16 and Veech signed at least 14 false and misleading management representation letters to Merge's outside auditor.  Most of these letters contained the following representations, among others: (a) Merge's financial statements were prepared in accordance with GAAP; (b) Merge recognized revenue in accordance with SOP 97-2; (c) there were no material transactions that were not properly recorded in Merge's accounting records underlying its financial statements; (d) there had been no (i) fraud involving

management or employees who had significant roles in internal control, or (ii) fraud involving others that could have a material effect on the financial statements; and (e) Merge did not enter into any side agreements with customers. Based on the facts discussed above, when Linden and Veech signed these management representation letters to Merge's independent auditors, Linden and Veech knew, or were reckless in not knowing, that these letters contained misrepresentations.

## COUNT I

### Violation of Section 17(a) of the Securities Act
### (Linden and Veech)

45.     The Commission realleges and incorporates by reference the allegations of paragraphs 1 through 44 as if fully set forth herein.

46.     Defendants Linden and Veech, directly or indirectly, knowingly, recklessly or negligently, in the offer or sale of a security, by the use of means or instrumentalities of interstate commerce or the mails: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or the omission of a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

47.     By engaging in the conduct described above, defendants Linden and Veech violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II

### Violation of Section 10(b) of the Exchange Act
### and Exchange Act Rule 10b-5
### (Linden and Veech)

48.     The Commission realleges and incorporates by reference the allegations of paragraphs 1 through 44 as if fully set forth herein.

49.     Defendants Linden and Veech, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of a material fact or omitted a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or course of business which operated or would operate as a fraud or deceit upon other persons.

50.     By engaging in the conduct described above, Defendants Linden and Veech violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## COUNT III

### Violation of Section 13(b)(5) of the Exchange Act
### and Exchange Act Rule 13b2-1
### (Linden and Veech)

51.     The Commission realleges and incorporates by reference the allegations of paragraphs 1 through 44 as if fully set forth herein.

52.     Defendants Linden and Veech circumvented or failed to implement a system of internal accounting controls and, directly or indirectly, falsified or caused to be falsified, books,

records or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

53.     By engaging in the conduct described above, Defendants Linden and Veech violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## COUNT IV
### Violations of Exchange Act Rule 13b2-2
### (Linden and Veech)

54.     The Commission realleges and incorporates by reference the allegations of paragraphs 1 through 44 as if fully set forth herein.

55.     Defendant Linden and Veech, directly or indirectly, (i) made, or caused to be made, materially false or misleading statements or (ii) omitted to state, or caused others to omit or state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, to an accountant in connection with an audit, review or examination of financial statements or the preparation or filing of a document or report required to be filed with the Commission.

56.     By engaging in the conduct described above, Linden and Veech violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## COUNT V
### Violations of Exchange Act Rule 13a-14
### (Linden and Veech)

57.     The Commission realleges and incorporates by reference the allegations of paragraphs 1 through 44 as if fully set forth herein.

58.     As the principal executive officers of Merge, Linden and Veech were required to, and did, certify Merge's annual report of Form 10-K for 2002 through 2004 and its quarterly reports on Forms 10-Q for its 2003 and 2004 fiscal quarters and the first three quarters of 2005. Among other things, Linden and Veech certified that: (a) the reports did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made not misleading; and (b) the financial statements and other financial information included in the report fairly presented in all material respects Merge's financial condition, results of operations, and cash flows.  These certifications were materially false.

59.     By engaging in the conduct described above, Linden and Veech violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.131-14].

## COUNT VI

**Violations**
**of Section 13(a) of the Exchange Act and**
**Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13**
**(Merge)**

60.     The Commission realleges and incorporates by reference the allegations of paragraphs 1 through 44 as if fully set forth herein.

61.     Section 13(a) and Rules 13a-1, 13a-11, and 13a-13 thereunder, require issuers of registered securities to file with the Commission factually accurate annual and quarterly reports (Form 10-K and Form 10-Q) and certain current information with the Commission (Form 8-K). Rule 12b-20 further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be

21
Case 2:09-cv-01036-CNC   Filed 11/04/09   Page 21 of 25   Document 1

necessary to make the required statements, in light of the circumstances under which they were made, not mislead.

62.     By engaging in the conduct described above, Merge violated Section 13(a) of the Exchange Act and Rule 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

## COUNT VII

### Aiding and Abetting Violations
### of Section 13(a) of the Exchange Act and
### Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13
### (Linden and Veech)

63.     The Commission realleges and incorporates by reference the allegations of paragraphs 1 through 44 and 61 through 62 as if fully set forth herein.

64.      By engaging in the conduct described above, Defendants and Veech provided substantial assistance to Merge in its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13], thereby aiding and abetting the Company's violations of the aforementioned provisions.

## COUNT VIII

### Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act
### (Merge)

65.     The Commission realleges and incorporates by reference the allegations of paragraphs 1 through 44 as if fully set forth herein.

66.     Section 13(b)(2)(A) of the Exchange Act requires issuers to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the issuer's assets.  Section 13(b)(2)(B) of the Exchange Act requires issuers to

devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with US General Accepted Accounting Principles and to maintain accountability for the issuer's assets.

67.     By engaging in the conduct described above, Defendant Merge violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## COUNT IX

### Aiding and Abetting Violations
### of Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act
### (Linden and Veech)

68.     The Commission realleges and incorporates by reference the allegations of paragraphs 1 through 44 and 66 through 67 as if fully set forth herein.

69.      By engaging in the conduct described above, Defendants Linden and Veech provided substantial assistance to Merge and thereby aided and abetted Merge in its violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Order a Final Judgment permanently, restraining and enjoining Defendants Linden and Veech from violating Section 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act, and Rules10b-5, 13b2-1, 13b2-2, and 13a-14 thereunder, and for aiding and abetting violations of Sections13(a) and 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

II.

Order a Final Judgment permanently, restraining and enjoining the Defendant Merge, and its agents, servants, employees, attorneys in-fact, and all persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

III.

Pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, prohibit Defendants Linden and Veech from acting as an officer or director for five years of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to filed reports pursuant to Section 15(d) of the Exchange Act.

IV.

Order Defendants Linden and Veech to disgorge ill-gotten gains, plus prejudgment interest thereon, in the amount of $500,000 for Linden, and in the amount of $230,000 for Veech.

V.

Pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], order Defendants Linden and Veech to pay civil penalties, in the amount of $90,000 for Linden, and in the amount of $50,000 for Veech.

VI.

Grant any equitable relief that may be appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) [15 U.S.C. §78u(d)(2)].

24

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant Orders for such further relief as the court may deem just and appropriate.

Dated: November 3, 2009                    Respectfully submitted,

  _/s/Eric M. Phillips_____
James A. Davidson (IL Bar No. 6206786)
Eric M. Phillips (IL Bar No. 6237871)
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
175 W. Jackson, Suite 900
Chicago, IL 60604
(312) 353-7390